**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEBORAH ROTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14 C 04406 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | Judge John J. Tharp, Jr. |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Deborah Roth seeks judicial review of the Commissioner of Social Security's determination that she is not disabled and is therefore ineligible to receive Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Now before the Court is Roth's motion for summary judgment. Mot. Summ. J., ECF No. 8. For the following reasons, the Court grants Roth's motion and remands for further proceedings consistent with this Opinion.

## BACKGROUND

### I.     Factual and Procedural Background

Roth was born on February 13, 1959. R. 89.[1] She completed high school and two years of college and received certifications in real estate and as a paralegal. R. 31. Roth worked as a realtor in Indiana for nearly 24 years but lost her business in the 2008 market crash. R. 36, 50. At the time of the administrative hearing, Roth was working 20-22 hours per week as a customer service representative, answering phones and taking messages.[2] R. 34. She maintains that since

---

[1] Citations to R. refer to pages in the administrative record, which was filed as ECF Nos. 5-5–5-12.

[2] "The fact that [the claimant] pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain, does not preclude her from establishing that

August 2010, she has been disabled due to limitations related to her major depressive disorder, anxiety disorder, and generalized pain disorder, and that she also suffers from residual stomach pain and gastrointestinal issues after the removal of her appendix and a malignant tumor. R. 30.

On December 2, 2010, Roth filed applications for DIB and SSI benefits, alleging disability beginning August 1, 2010. Roth's applications were denied initially on March 2, 2011 and upon reconsideration on July 25, 2011. Roth requested and received a hearing before an administrative law judge ("ALJ"), at which Roth (who was represented by counsel), a medical expert, and a vocational expert testified. R. 30-64. After the administrative hearing, the ALJ denied Roth's claim on the ground that she is not disabled. R. 74-90. The Social Security Appeals Council subsequently denied Roth's request for review, leaving the ALJ's decision as the final decision of the Commissioner. R. 1–6; *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). Roth now seeks review of that decision pursuant to 42 U.S.C. § 405(g).

## II.    Medical Evidence

On August 2, 2010, Roth underwent a CT scan of her abdomen and pelvis which revealed a 5.6 centimeter abscess or mass growing on her appendix. R. 448-49. She was admitted to Swedish Covenant Hospital from August 7 through August 10 and underwent a laparoscopic appendectomy (removal of her appendix). R. 324. Once her appendix was removed, it was determined that the tumor was cancerous. R. 313. On September 3, 2010, Roth had a colonoscopy and then, on September 7, 2010, she underwent a laparoscopic right hemicolectomy

---

she was disabled." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013). As explained *infra*, the Social Security disability determination is based on whether an applicant is able to engage in substantial gainful activity ("SGA"), a determination based on the total amount earned per month. *See* 20 C.F.R. § 404.1574.

(removal of the right side of her colon), which tested negative for any residual cancerous cells. R. 313, 334.

On November 30, 2010, Roth went to the emergency room at John Stroger Hospital ("Stroger"), reporting depressed mood, insomnia, decreased appetite, decreased concentration, and hopelessness. R. 344. She appeared depressed and tearful. R. 482. Roth also reported right hip pain, but x-rays of the hip were normal. R. 350, 465.

On January 18, 2011, Roth underwent a consultative internist examination with a physician (Dr. Lansky) for the purpose of evaluating her disability claim. R. 385. Roth reported constant abdominal pain, irregular bowel movements, fecal incontinence, generalized pain all over, and feeling tired all the time. R. 385. She also noted pain in her right hip with radiation into her right leg and a burning sensation in her left leg and foot, but it did not limit her ability to ambulate. R. 386, 388. Roth indicated that she felt depressed but denied suicidal ideation. R. 386. Dr. Lansky noted that Roth was pleasant during the examination but appeared to be in mild to moderate distress and that she cried throughout the examination. R. 387. Roth reported a 20-year history of depression, that she had been a smoker for 20 years, and that she drank several times per week. R. 386. Roth was able to move around the exam room without evidence of discomfort, had a normal gait, normal range of motion, normal grip strength, and normal reflexes. R. 387. She had tenderness in her abdomen, paraspinals, hips, and sacroiliac joints, but her range of motion was normal. R. 387. She had a positive straight leg raise test on the right, at 55 degrees. R. 387. Dr. Lansky noted that the examination was difficult due to Plaintiff's distress. R. 387.

On January 27, 2011, Roth underwent a consultative psychological examination with a psychiatrist, Dr. Langgut. He noted that Roth sobbed throughout the exam, due to acute depression and anxiety, fear, and despondency. R. 378. She reported strained relationships with

her family, including her children. R. 380. Dr. Langgut noted that Roth was cooperative and polite, but negative and preoccupied during the exam, with a strong inner agenda. R. 380. She reported depression (but no history of depression), anxiety, sleep problems, decreased concentration, daily mood disturbance, psychomotor agitation, irritability, fluctuating appetite, frequent tearfulness, and feelings of hopelessness and worthlessness, and admitted to current suicidal ideation. R. 380. Roth reported that she worked 18 hours a week at an answering service, that she had modestly consumed alcohol in the past but did not recently do so, and that she was no longer able to afford cigarettes. R. 379. Between 2008 and 2009, Roth took Lexapro and Seroquel but stopped when she lost her health insurance. R. 379. She reported never having been in mental health therapy and seeking outpatient treatment but not pursuing it based on a long waiting list. R. 379. Dr. Langgut indicated that Roth was quite upset, which may have negatively affected her performance on questions regarding her mental capacity: her short-term memory appeared intact but she had difficulty shifting topics and was preoccupied by her current situation. R. 380-81. She had a mild degree of ruminative ideations but was not obsessive nor did she demonstrate any hallucinations, delusions, or phobias. R. 381. She did have some difficulty noting similarities between objects, but she demonstrated adequate judgment, responsibility, and arithmetic reasoning skills, and was able to understand the effects of her actions on herself and others. R. 381. Dr. Langgut diagnosed Roth with major depressive disorder, moderate. R. 381.

On February 28, 2011, non-examining Disability Determination Services ("DDS") medical consultant (Dr. Pilapil) opined that Roth would be able to sit, stand, and/or walk a total of six hours in an eight-hour workday. R. 371. He indicated that Roth should be limited to occasional stooping due to intermittent abdominal pain. R. 372. Another non-examining state agency evaluator affirmed that opinion on July 21, 2011. R. 527.

On March 7, 2011, Roth went to the emergency department at Swedish Covenant Hospital complaining of severe depression. R. 395. She reported that she was receiving "psych care at Cook [C]ounty" but that she was not happy with it, and that her symptoms had worsened with the recent death of her dog. R. 395. Because she was not suicidal or homicidal, Roth was not admitted but was referred to a social worker for assistance. R. 400. Roth saw a social worker for a psychiatric evaluation at Stroger Clinic on March 11, 2011, at which she reported increased feelings of hopelessness, middle insomnia, decreased appetite and energy, and anhedonia, despite complying with her medications. R. 495. She was diagnosed with major depressive disorder, without psychotic features. R. 496-97. Roth was seen at various medical centers reporting similar depressive symptoms and associated pain on April 8, 2011 (R. 504-11), May 11, 2011 (R. 475-79), June 29, 2011 (R. 578-79), October 7, 2011 (R. 555-63), December 1, 2011, (R. 569-71), January 4, 2012 (R. 550-54, 666-68), March 28, 2012 (R. 589-91), June 7, 2012 (R. 681-82), July 11, 2012 (R. 690-92), October 2 and 3, 2012 (R. 694-97), and January 15, 2013 (R. 699-701).

Between June 1 and September 23, 2011, Roth had weekly (approximately) individual counseling appointments with a social worker, Ms. Jacobson, at Jewish Child and Family Services. R. 521-24, 530-48. Roth reported her depressive symptoms, and Jacobson helped her establish and work towards a number of goals. R. 538-39. Jacobson diagnosed Roth with major depressive disorder, single episode, unspecified and pain disorder associated with both psychological factors and general medical condition. R. 539. The notes from these counseling

appointments indicate Roth's Global Assessment of Functioning ("GAF") score ranged from 55 to 65.[3] *See, e.g.*, R. 539, 541.

Between February 8 and June 20, 2012, Roth saw a different social worker at Jewish Child and Family Services, Ms. Greenfield, approximately ten times.[4] R. 595-602. On June 26, 2012, Greenfield completed a report regarding Roth's impairments. She indicated that Roth suffered from major depressive disorder, anxiety disorder, and a pain disorder associated with both psychological factors and a general medical condition. R. 599. She opined that Roth's affective disorder moderately impacted her social functioning, markedly restricted her daily living and her ability to maintain concentration, and caused three episodes of decompensation of extended duration. R. 601. Greenfield further opined that Roth's anxiety-related disorder markedly impacted her social functioning and her ability to maintain concentration. R. 602. Greenfield checked "no" when asked whether she believed Roth was "able to function in a competitive work setting ( . . . in an environment with time and productivity demands) on an eight-hour per day, five days per week basis." R. 600.

## III. The Administrative Hearing

At the January 23, 2013 administrative hearing, attorney Jim Brown represented Roth. Roth testified, answering the ALJ's initial questions about her background, education, and work history. R. 30-37. Roth testified about her depression and the related pain. R. 37-38. Describing what her depression feels like, Roth testified:

---

[3] A GAF score measures both the severity of an individual's symptoms and her functional level. The final GAF score is the lower of the two scores. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32-34 (Text Revision, 4th ed. 2000)).

[4] At the administrative hearing in January 2013, Roth testified that she was continuing to see a counselor at Jewish Family Services once per week. R. 41. There are no medical records pertaining to appointments at Jewish Family Services, however, post-June 2012.

> A horrible day, just hopelessness. I get these little like, sensations through my body that scare me, the pain is just horrible, I hurt all the time, fatigue, I feel so tired, and then, when I lay down, I can't sleep, I worry about everything.

R. 38. She is able to cook her own meals, do household chores, and grocery shop, although she feels fatigue and tries to do as much as she can on the "good day[s]." R. 43, 47. In response to a question as to whether therapy or medications have helped alleviate or lessen her depression and pain, Roth stated:

> Somewhat. It will for a little bit, and then, I just start feeling overwhelmed again. It's just a sensation that just overcomes my body where I just feel total panic, and hopelessness, and—like, you just want to hurry up and go to a hospital . . . .

R. 41.

At the time of the administrative hearing, Roth worked five mornings a week, from 8 a.m. to 1 p.m. R. 34. When questioned about her current part-time job, Roth testified that even small changes in the work setting really upset her, R. 41-42, and noted that she has been disciplined a number of times for attendance and making errors. R. 34-35. She explained that she would not be able to do her answering-service job full time: she "can barely make it through a part-time day" because she "start[s] hurting so bad everywhere normally after about four hours, and then, just the mistakes." R. 37. Roth hypothesized that, in a factory-like setting where she would not have to talk to anyone and would do the same activity all day long, her "pain would overwhelm [her] standing." R. 42-43.

Pursuant to the ALJ's discretion to seek the opinion of a non-treating medical or psychological expert, Dr. Cathy Krosky listened to Roth's testimony and then testified as to Roth's physical impairments. *See* R. 51; 20 C.F.R. § 404.1529(b) (ALJ "may ask for and consider the opinion of a medical or psychological expert concerning whether [claimant's]

impairment(s) could reasonably be expected to produce [the] alleged symptoms."). She had reviewed Roth's medical records and stated that she was familiar with the listings of impairments in the Social Security Regulations. R. 51. Dr. Krosky walked through a number of Roth's medical records, R. 52-56, then opined that none of the physical complaints individually or collectively merited "a listing."[5] R. 56. In terms of restrictions, she opined that Roth should be limited to six hours of standing and/or walking in an eight-hour day, light work with occasional stooping and crouching, and occasional lifting of 20 pounds, but frequently only 10 pounds. R. 56-57.

James Radke, a vocational expert ("VE"), listened to the testimony and then testified about Roth's employment prospects. R. 58-63; *see* 20 C.F.R. § 404.1506(b)(2) (ALJ has discretion to rely on testimony of VE). VE testimony helps to determine whether a claimant's "work skills can be used in other work and the specific occupations in which they can be used." 20 C.F.R. § 404.1566(e). At a hearing, a VE may answer "a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2). Radke testified that Roth's past work as a realtor is a skilled job defined as light and that her current part-time job is semi-skilled, sedentary as defined and performed. R. 60.

_____

[5] "A listing" refers to the listed impairments enumerated in 20 C.F.R. Pt. 404, Subpart P., App. 1. *See Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. § 404.1520(d)) ("[A] claimant is eligible for benefits if she has an impairment that meets or equals an impairment found in the Listing of Impairments."). Dr. Krosky's testimony that Roth's problems did not merit a listing presumably reflects her medical judgment that Roth's complaints did not rise to the level of the conditions included in the Listing of Impairments.

The ALJ posed several hypothetical questions to Radke regarding employment prospects for hypothetical individuals sharing Roth's age, education, and work history. Restricting work to medium exertion level, no ladders, ropes, or scaffolds, limited to only simple, routine, repetitive tasks, and a work environment free of fast-pace production requirements, with limited work-related decision making, few, if any, changes in the work setting, no public contact, and no more than occasional contact with coworkers and supervisors, Radke stated that Roth's past work would not be available. R. 60-61. When asked what types of jobs such an individual could perform, Radke answered by listing the jobs of a food-prep worker (5,700 positions in the northeastern Illinois area) and hand-packers (8,000 positions). R. 62. If further limiting the restriction to light exertion, Radke listed the jobs of hand packers (15,000 positions), laundry workers and sorters (1,300 positions), and cleaners (9,800 positions). R. 61. The ALJ posed a third hypothetical to Radke, further limiting the restriction to sedentary: Radke stated that there are no jobs at the sedentary level consistent with all of the aforementioned restrictions and limitations. R. 62-63. The ALJ followed-up, asking how it would affect his opinion if the hypothetical person had to be off work at least three days per month for medical reasons. R. 63. Radke opined that such a limitation would be work preclusive. R. 63.

The claimant's attorney concluded the hearing by noting a potential later alleged onset date: Roth testified about her worsening condition within the year and a half prior to the administrative hearing. *See* R. 67, 550. Her attorney requested that, if the ALJ did not find Roth disabled as of her original onset date of August 1, 2010, that the ALJ consider an alternative onset date of January 24, 2012. R. 67.

## IV.    The ALJ's Decision

The ALJ issued a decision that Roth was not disabled, and therefore denied her applications for DIB and SSI. To evaluate whether Roth was disabled and entitled to benefits, the ALJ followed the five-step sequential inquiry that is prescribed by Social Security regulations. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The five steps proceed as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (quoting *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "A finding of disability requires an affirmative answer at either step three or step five." *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). In each of the first four steps, the claimant bears the burden of proof. *Weatherbee*, 649 F.3d at 569 (citing *Briscoe*, 425 F.3d at 352). The government bears the burden at the final step and must present evidence establishing that the claimant's RFC, which is the most that the claimant can still do despite her limitations, enables her "to perform work that exists in a significant quantity in the national economy." *Id.* (citing 42 U.S.C. § 423(d)(2)(A); *Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009)); 20 C.F.R. §§ 404.1545(a), 416.945(a).

In this case, the ALJ determined at step one that Roth has not engaged in substantial gainful activity since August 1, 2010, the alleged disability onset date. R. 79. At step two, the ALJ found that Roth has the following severe impairments: status post right laparoscopic hemicolectomy; status post laparoscopic appendectomy; status post carcinoid tumor serosal invasion of colon; history of alcohol abuse;[6] diffuse body pain; and major depressive disorder. R. 79. At step three, the ALJ determined that Roth does not have an impairment that meets or medically equals one of the listed impairments that are conclusively disabling. In support of this finding, the ALJ explained that she considered the criteria for "paragraph B" and "paragraph C" of listings 12.04 (affective disorders) and 12.09 (substance addition disorders). R. 80. Based on Roth's testimony at the administrative hearing, the ALJ stated that Roth had mild restriction in her daily living because "she lives alone, walks her dog, works part-time, makes easy meals, cleans, does laundry with breaks and shops." R. 80. As to social functioning and concentration, persistence, or pace, the ALJ focused on Dr. Langgut's January 2011 examination to conclude that Roth had moderate difficulties. R. 80. She also commented the Roth had experienced no episodes of decompensation, noting that Roth was not psychiatrically hospitalized. R. 80.

Prior to step four, the ALJ determined that Roth has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b). According to the RFC, Roth can lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and can do a job that "requires a good deal of walking or standing, or

---

[6] Roth notes the lack of medical evidence in the record supporting the finding of a history of alcohol abuse, including no diagnosis. Mem. in Supp. 9 n.2. Although the medical records are inconsistent as to the extent of Roth's alcohol consumption, *compare* R. 379 ("reported only a modest use of alcohol, with no recent use" in January 2011) *with* R. 396 ("alcohol frequent" in March 2011), this Court's review of the record also results in a dearth of evidence supporting this finding. Because the ALJ did not rely on this finding to support her conclusion that Roth is not disabled, however, Roth did not address the issue in detail. Mem. in Supp. 9 n.2.

[that] involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* The ALJ found that Roth was limited "to simple work in low stress work setting with limited social interaction to address deficits from [her] mental impairments." R. 87.

In making this determination, the ALJ explained a number of factors that she found undercut Roth's credibility, including the fact that Roth stopped working because of the real estate market crash and not for reasons related to her disability. R. 88. The ALJ did not give Roth's most recent therapist's opinion much weight because her report "appears to contain inconsistencies" and is "without substantial support from other evidence of record," and because of the potential for a treating source to express an opinion to assist a patient with whom she sympathizes. R. 87-88. In contrast, the ALJ gave substantial weight to Dr. Krosky's testimony as to Roth's physical impairments and to the DDS psychological assessment because both opinions are consistent with other medical evidence in the record. R. 87.

The ALJ concluded at steps four and five that while Roth is unable to perform her past work as a realtor, based on the testimony of the vocational expert, Roth is able to perform other work available in the national economy. R. 89-90. On that basis, the ALJ found that Roth is not disabled and is therefore ineligible for DIB and SSI. R. 90. The Appeals Council denied review, leaving the ALJ's decision as the final word of the Commissioner. *See Roddy*, 705 F.3d at 636. Roth now appeals the unfavorable decision.

## DISCUSSION

Under the Social Security Act, a person is eligible for disability benefits if she is insured for disability benefits, has not attained retirement age, has filed an application for disability insurance benefits, and suffers from a "disability." 42 U.S.C. § 423(a)(1). A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the impairment or impairments must not only prevent the claimant from doing her previous work, but considering her age, education, and work experience, must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A disabled person is eligible for SSI if she meets certain income requirements. 42 U.S.C. § 1382(a).

The Social Security Act authorizes district courts to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court reviews the Commissioner's legal determinations *de novo* and the Commissioner's factual findings deferentially. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) (the Commissioner's factual findings are "conclusive" if supported by substantial evidence). The Commissioner's decision will therefore be upheld unless the findings are not supported by substantial evidence or the decision resulted from the application of an erroneous legal standard. *See Briscoe*, 425 F.3d at 351; *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jones*, 623 F.3d at 1160 (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The standard requires "more than a scintilla" but can be satisfied by "less than a preponderance." *Skinner*, 478 F.3d at 841. However, a court "cannot uphold an administrative decision that fails to mention highly pertinent evidence or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case

and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (internal citations omitted). A reviewing court must confine itself to the rationale offered by the ALJ and not new rationales offered on appeal. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); *see also SEC v. Chenery Corp.,* 318 U.S. 80, 87-88 (1943).

A court reviewing the Commissioner's decision reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the Commissioner. *See Schmidt*, 395 F.3d at 744; *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner; "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *see also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (vacating and remanding where the ALJ mischaracterized the record). In addition to meeting these standards, the Commissioner must articulate enough detail and clarity in the analysis to allow a reviewing court to conduct meaningful appellate review. *Briscoe*, 425 F.3d at 351; *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (requiring the ALJ to "articulate at some minimal level her analysis of the evidence to permit an informed review"). The Commissioner is "not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing *Steele*, 290 F.3d at 941). To build a logical bridge, an ALJ must "sufficiently articulate [her] assessment of the evidence to assure [the reviewing court] that [she] considered the important evidence . . . and to enable [the reviewing court] to trace the path of [her] reasoning." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (quoting *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)). Roth challenges the ALJ's

decision on two grounds: (1) the ALJ's decision to award only "some weight" to Roth's treating

therapist; and (2) the ALJ's assessment of Roth's credibility. *See* Mem. in Supp. 10-15.

## I.        Weight Given to Greenfield's Opinion

Roth contends that the ALJ improperly allocated limited weight to Roth's treating

therapist's opinion and substantial weight to non-treating DDS psychological and physical

assessments. "An ALJ must give 'controlling weight' to a treating source's opinion if it is 'well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence.'" *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir.

2011) (quoting 20 C.F.R. § 404.1527(d)(2)). In considering Greenfield's opinion, the ALJ noted

that the report appears to contain inconsistencies, explaining, "[a]lthough Greenfield opined that

the claimant's ability to maintain social functioning was moderately limited, elsewhere in her

report, she opined that that the claimant's illness markedly restricted social interaction." R. 87.

The ALJ (and the government) misread the report; Greenfield checked that Roth's affective

disorder moderately impacted her social functioning (R. 601), that her anxiety disorder markedly

impacted her social functioning (R. 602), and that, overall, Roth's illness markedly restricts her

socialization (R. 599). An "affective disorder" (Listing 12.04) is defined as "a disturbance of

mood, accompanied by a full or partial manic or depressive syndrome"; with an "anxiety

disorder" (Listing 12.06), by contrast, "anxiety is either the predominant disturbance or it is

experienced if the individual attempts to master symptoms; for example, confronting the dreaded

object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive

compulsive disorders." 20 C.F.R. Pt. 404, Subpart P., App. 1, §§ 12.04, 12.06. Although

Greenfield checked that Roth's social functioning was both moderately and markedly restricted,

these differences correspond to two distinct disorders and are therefore not inconsistent.

The ALJ further faulted Greenfield's opinion for noting that Roth had three episodes of decompensation although "the medical evidence of record does not document any hospitalizations due to the claimant's psychiatric symptoms." R. 87. As Roth explains, however, "episodes of decompensation" is not defined as narrowly as the ALJ's opinion indicates. The Social Security Administration defines episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010) (quoting 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00). While a period of hospitalization due to psychiatric symptoms qualifies as an episode of decompensation, "so would many other scenarios," including "medical records showing a significant alteration in medication." *Larson*, 615 F.3d at 750. Although Greenfield did not provide narrative commentary explaining the episodes of decompensation (this section, as opposed to other sections of the questionnaire, did not provide space for such narrative, *see* R. 601), Roth's many trips to the emergency room due to complaints of severe depression support Greenfield's assessment. *See Larson*, 615 F.3d at 751 ("Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records."); *Johnson v. Apfel,* 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's rejection of physician's check-box form where it was contradicted by evidence in the record).

In concluding that Greenfield's opinion was without substantial support from the record, the ALJ highlighted that Roth's "symptoms have been stable on prescribed treatment with the claimant admitting that the medications have been relatively effective." R. 88. Roth argues that stability does not necessarily indicate a minimum level of functioning and that noting that one is

"responding to treatment" fails to account for the fluctuation inherent in mental illness. Mem. in Supp. 11-12. Roth cites a number of Seventh Circuit cases that fault ALJs for cherry picking notes from "good days," explaining that "a snapshot of any single moment says little about [the claimant's] overall condition." *Punzio*, 630 F.3d at 710; *see* Mem. in Supp. 12 (citing cases). While the ALJ spent much of her opinion highlighting the portions of the records where Roth reported that the medications were helping, she also noted that Roth continued to complain of depression and pain throughout the same periods. *See* R. 84 (noting changes in Roth's medication because she continued to cry frequently, feel sad and hopeless, suffer from middle insomnia, and experience chronic pain), *id.* (noting an increase in the Effexor prescription but Roth "was not sure if it helped"), 84-85 (psychiatrist increased Roth's medications due to continued complaints of depression and pain). In reaching her conclusion, however, the ALJ committed the same error the Seventh Circuit has so frequently warned against: she focused solely on the reports of stability and ignored the many complaints of persisting symptoms. *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability."). The ALJ thus erred in concluding that because the record evidence reflected some improvement and response to medications, it did not support Greenfield's opinion.

Roth's final complaint regarding the ALJ's consideration of Greenfield's opinion is the ALJ's comment on the possibility of a treating source sympathizing with a patient and offering an opinion in effort to help that patient. *See* R. 88. The ALJ noted the difficulty in confirming such an occurrence but stated that it was more likely "where the opinion in question departs substantially from the rest of the evidence of record, as in the current case," and included that as

a reason to give Greenfield's opinion limited weight. R. 88. As already explained, the ALJ erred in concluding that the evidence of record did not support Greenfield's opinion, and without that inference, there is absolutely no evidence Greenfield's opinion was offered out of sympathy.

The ALJ erred in giving Greenfield opinion's limited weight; she failed to offer reasonable explanations for discounting Greenfield's opinion in comparison with the substantial weight given to the non-treating physical and psychological opinions. *See Punzio*, 630 F.3d at 710 ("whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision"); *Scott*, 647 F.3d at 739 ("An ALJ must offer 'good reasons' for discounting the opinion of a treating physician."). Greenfield's opinion, if credited, would weigh in favor of a finding that Roth is disabled. *See* R. 601-02 (noting that Roth's affective disorder markedly restricted her daily living and her ability to maintain concentration, persistence or pace, and that Roth's anxiety disorder markedly impacted her social functioning and her ability to maintain concentration, persistence or pace); 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04.

## II.      The ALJ's Assessment of Roth's Credibility

Roth also takes issue with the ALJ's credibility assessment: the ALJ found that Roth's impairments "could reasonably be expected to cause the alleged symptoms" but found Roth's statements concerning "the intensity, persistence and limiting effects" of her symptoms not entirely credible. R. 86. The ALJ noted that Roth's complaints of physical pain "were not supported by the clinical findings and x-rays" and highlighted a physical exam that "showed essentially normal." R. 86. Roth's treating sources and even the doctor who testified at the administrative hearing, however, noted that her pain was associated with her psychological factors, also called somatization disorder. *See* R. 57 ("I believe she is feeling the pain, but I think it might be more secondary to the depression."), 539, 552, 562, 584 ("joint pan may be real but

may be due to underlying psych disorder"), 589, 599. That x-rays did not identify a physical cause for Roth's physical pain does not undercut her credibility when the medical evidence is replete with notations of somatization disorder. Nor does the ALJ's assertion that Roth's treatment "has been generally successful in controlling [her] symptoms" undermine Roth's credibility as to their limiting effects, particularly when the record shows her symptoms were waxing and waning. R. 86 ("[A]lthough the Stroger clinic notes show waxing and waning of her depression symptoms, overall, they reveal that she has experienced improvement on prescribed medications."); *see also Larson*, 615 F.3d at 751 ("symptoms that 'wax and wane' are not inconsistent with a diagnosis of recurrent, major depression").

The ALJ also considered it discrediting that Roth lost her full time job as a result of the real estate market crash rather than as a result of her alleged disability. R. 88. The reason Roth lost her job as a realtor in 2008 is not relevant to the determination of whether she is disabled as of August 1, 2010. Roth does not claim that she applied for benefits because she lost her job; indeed, the alleged date of disability is two years after Roth lost her job as a realtor. Rather, Roth testified that she became severely depressed after a series of misfortunes—"everything just went away. I lost my home, I lost my job, I lost my career, basically my family" and then Roth was diagnosed with cancer. R. 50. Thus, the ALJ erred in discounting Roth's credibility based on the reason she lost her job as a realtor.

Nor was it entirely proper for the ALJ to express doubt about Roth's credibility based on the description of Roth's daily activities; the ALJ noted that Roth can walk to the store and take the train, cook meals and occasionally do laundry. R. 88. Roth never alleged that she was immobilized; she testified that she has a "good day" every two or three weeks and does as much as she can on those days. R. 43. The Seventh Circuit has explained that failure to recognize the

differences between a claimant's ability to accomplish daily tasks and her ability to hold a full time job "is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012); *see also Stage v. Colvin*, No. 15-1837, 2016 WL 492333, at *5 (7th Cir. Feb. 9, 2016) (ALJ "erred by basing his adverse credibility determination on [ ] grounds that we have repeatedly held improper: . . . [claimant's] ability to care for herself"). The comparison between Roth's daily activities and her ability to hold a full-time job is not as inappropriate in this case as in many others, however, because part of Roth's daily activities is her part-time employment, 20-22 hours per week. That Roth is able to operate in a work-environment for 5 hours per day (although, not without difficulties, *see* R. 34-36) is a legitimate consideration in determining the severity of the disabling limitations to which she testified.

## III.     Remedy

Roth argues that, in light of these errors, reversal and award of benefits is the proper remedy here; in the alternative, she asks that the matter be remanded. If the reviewing court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is the appropriate remedy unless the evidence . . . compels an award of benefits." *Briscoe*, 425 F.3d at 355 (citing *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)). An award of benefits is only compelled "where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (quotation marks and citation omitted). Here, the reasons for reversal are the ALJ's failure to give proper weight to Roth's treating therapist's opinion and the ALJ's improper discounting of Roth's credibility. Although reconsideration of both issues weighs in Roth's favor, the Court is not convinced that the record yields but one

supportable conclusion, particularly in light of Roth's ability to sustain part-time employment for at least two years. *See* R. 34. Remand is therefore the appropriate remedy.

Remand is not warranted, however, if the administrative error is harmless. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)). Whether error is harmless is a "prospective" question that requires a reviewing court to "look at the evidence in the record to see if [it] can predict with great confidence what the result on remand will be." *McKinzey*, 641 F.3d at 892. It is decidedly not "an exercise in rationalizing the ALJ's decision and substituting [the court's] own hypothetical explanations for the ALJ's inadequate articulation." *Id*; *see also Spiva*, 628 F.3d at 353 ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time."). While it is possible that an ALJ who considers all of the evidence in this case will reinstate the ALJ's decision on remand, it is not fair to say that the decision is so overwhelmingly supported by the record that the Court can predict that result with great confidence. After reconsidering Ms. Greenfield's opinion and reevaluating Roth's credibility, the ALJ may change her overall assessment of the severity, persistence, or limitation on function of Roth's disability. The ALJ's failures here, therefore, cannot be said to be harmless. To be sure, this Court is not re-weighing evidence or concluding that finding of disability is warranted; it is only saying that the ALJ's decision, as it currently stands, fails to permit an informed review.

*　　*　　*

For the foregoing reasons, the Court grants Roth's motion for summary judgment, vacates the opinion below, and remands this matter to the Social Security Administration for further proceedings consistent with this Opinion.

Dated: March 9, 2016

John J. Tharp, Jr.
United States District Judge